# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL ARRINGTON,** | : | |
| **Petitioner** | : | **No. 1:09-cr-0078-9** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| **Respondent** | : | |

## <u>MEMORANDUM</u>

Before the Court is Petitioner Michael Arrington's motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255. (Doc. No. 632.) The motion has been fully briefed and is ripe for disposition. Petitioner has also sought discovery. (Doc. Nos. 655, 658, 659.) For the reasons that follow, the Court will deny Petitioner's Section 2255 motion and his discovery motions.

## I.      BACKGROUND

On April 4, 2012, a federal jury found Petitioner Michael Arrington guilty on three counts: (1) possession with the intent to distribute 100 grams or more of heroin in violation of 21 U.S.C. § 841(a); (2) conspiracy to possess with the intent to distribute heroin in violation of 21 U.S.C. § 846; and (3) interstate travel in aid of unlawful activity, in violation of 18 U.S.C. § 1952(a)(3). (Doc. No. 575.) On September 7, 2012, the Court sentenced Petitioner to a 262-month term of imprisonment to run consecutively with any pending state sentences. (Doc. No. 594.) Petitioner appealed to the United States Court of Appeals for the Third Circuit, which issued a panel opinion denying his appeal on July 17, 2013. <u>See</u> <u>United States v. Arrington</u>, 530 F. App'x 143 (3d Cir. 2013). On September 29, 2014, Petitioner filed the present motion to vacate (Doc. No. 632), and he filed a brief in support of his motion on November 10, 2014 (Doc. No. 640). The Government filed a brief in opposition on November 28, 2014 (Doc. No. 641),

1

and after several extensions of time, Petitioner filed a reply brief on January 26, 2015 (Doc. No. 654).

Petitioner's prosecution commenced on September 23, 2009, when a federal grand jury indicted Petitioner and eight co-defendants via a superseding indictment.  (Doc. No. 171.)  Of the nine defendants named in the indictment, only Petitioner proceeded to trial, where a number of his co-defendants testified against him.  (See Doc. Nos. 610, 611, 612, 613.)  According to the indictment, Petitioner and his co-defendants engaged in at least one conspiracy to acquire drugs from other states, import them into Central Pennsylvania, and then distribute them to users.  (See Doc. No. 171.)  Petitioner's motion is based in part on objections to his counsel's treatment of three of these testifying co-defendants: Omar Davenport, Bobby Sue Miller, and Michael Wayne Sullivan.  (See Doc. No. 632.)

The first co-defendant called to testify was Omar Davenport.  (See Doc. No. 610; Tr. at 96: 12, et seq.).  Davenport, who had already pleaded guilty to reduced charges at the time of Petitioner's trial, testified that he had known Petitioner since "around 1995."  (Id. at 102: 24-25.)  Davenport's involvement in activities covered by the present indictment began in March of 2008 after he was paroled from state custody on unrelated charges.  (See id. at 99: 9 et seq.)  Davenport testified that while he was living in a halfway house, he was approached by Petitioner, who gave him $1000 and re-introduced him to drug trafficking and dealing.  (Id. at 103:18 – 106:21.)  Davenport testified that he had never dealt heroin before, but that Petitioner taught him how to "cut" heroin, weigh it, and divide larger quantities of heroin into smaller quantities for sale directly to users.  (Id. at 106:22 – 108:25.)  Davenport also testified that Petitioner introduced him to existing heroin users and helped him to identify new customers.  (Id. at 109: 1-13.)  Davenport testified that Petitioner would acquire wholesale quantities of heroin

from elsewhere, including New York, and that Petitioner would provide heroin to Davenport, who would then subdivide the heroin and sell it directly to customers.  (Id. at 109:24 – 110:19.)

Many of Petitioner's arguments concern Davenport's testimony about trips to New York to acquire heroin and defense counsel Laurence Kress's alleged failure to adequately cross-examine Davenport about those trips.  (See Doc. No. 640 at 2-5.)  One trip occurred on February 26, 2009.  (See Doc. No. 610, Tr. at 123:25 – 125:3.)  Davenport testified that he identified a possible new source of heroin supply in New York City, and that Petitioner told Davenport to "[c]heck it out."  (Id. at 124:10 – 125:25.)  Rather than go to New York himself, Davenport sent co-defendants Bobbie Sue Miller, Ashley Nesbitt, and Kareem Owens.  (Id. at 126:6 – 129:7.)  The three acquired heroin from a man named "Rum" while they were in New York, and they were driving the drugs back to Harrisburg when they were stopped by police and arrested.  (Id.)  Davenport testified that on February 27, 2009 – the day after his co-defendants were arrested – Davenport and Petitioner traveled to Baltimore.  (Id. at 130:1-4.)  Davenport testified that the next day – February 28, 2009 – he left Petitioner in Baltimore and traveled to New York with co-defendant Michael Wayne Sullivan.  (Id. at 130:5-19.)  Davenport and Sullivan were arrested several days later while meeting another contact at the Staten Island Ferry parking lot.  (Id. at 132:9-15.)

On cross examination, defense counsel Kress elicited testimony about another trip to New York City – one that occurred prior to the events of February 2009.  (Id. at 143:14 – 144:3.)  Davenport testified that on at least one other occasion, he had traveled to New York City with co-defendant Bobbie Sue Miller to meet Petitioner.  (Id.)  Davenport testified that once he and Miller arrived in New York to acquire drugs from Petitioner, Petitioner "decided he didn't need me and brought it back himself."  (Id.)  Defense counsel did not elicit any further detail from

3

Davenport about this trip.  (Id.)  However, attorney Kress did press Davenport about other issues, including in particular allegations that Davenport manipulated co-defendant Bobbie Sue Miller and influenced her to testify falsely against Petitioner.  (See id. at 145:2-5) ("Q: You never tried to get anyone to lie for you? A: Probably.  I mean, you're asking me to remember a lot.  Q: Did you ever try to get Bobbie Miller to lie for you? A: Probably, yeah.").

Attorney Kress also offered a letter into evidence.  (Id. at 145:17-18.)  Davenport wrote the letter to Bobbie Sue Miller while they were in custody awaiting trial.  (Id. at 145:6 – 146:20.)  In the letter, Davenport asked Miller to tell the "truth," by telling the police that Davenport was not involved in the preparation or planning for the February 26, 2009 trip to New York City, and by telling the police instead that Petitioner had masterminded the trip.  (See id. at 146:1-8.)  Davenport testified that with the letter, he was attempting to manipulate Miller into "tak[ing] the blame" for him.  (Id.); (see also id. at 147:15 – 148:15) (Davenport reading the letter in its entirety on re-direct examination).  On re-cross examination, Davenport testified that the letter "didn't work," and that Miller implicated him in the planning for the New York trip despite his letter.  (Id. at 150:8-17.)

Once Davenport had finished giving testimony, the Government called Bobbie Sue Miller to testify.  (Id. at 151:23 et seq.)  According to her testimony, Ms. Miller became involved in drug trafficking after she met Mr. Davenport following his state parole in March 2008.  (See id. at 153:1-5; 155:14 – 156:8.)  Miller testified that she and Davenport met at the restaurant where they were both employed and that they entered into a romantic relationship that lasted into 2009.  (Id. 156:2-8.)  Miller testified that she found out about Davenport's drug dealing in October or November 2008 after she questioned him about a large sum of money that she witnessed, and that she began helping him in the drug trade by making deliveries of heroin to customers and by

storing drugs at her apartment.  (Id. at 156:13 – 163:2.)  On direct examination, Miller identified

Petitioner as the man she had seen delivering heroin to Davenport.  (Id. at 163:3-15.)  She

testified that she met Petitioner in November of 2008 and that Petitioner would take cash from

Davenport in exchange for blocks of heroin, including at least on instance when she witnessed

such an exchange personally.  (Id. at 166:3 - 168:13.)  Miller testified that Davenport identified

Petitioner as the source of his heroin, and that the supply originated in New York.  (Id. at 169:9-

20.)

Miller also testified about the February 26, 2009 trip to New York to pick up heroin.  (Id.

at 174:20 et seq.)  Miller testified that Davenport sent her to New York with Ashley Nesbitt and

Kareem Owens, though Miller also testified that Petitioner was originally supposed to travel to

New York with her.  (Id. at 175:2-4.)  The trio drove to New York in Miller's car, acquired

heroin from "Rum," and then drove back to Pennsylvania, where Miller testified that they were

pulled over for speeding.  (Id. at 175:5 – 177:17.)  During the stop, officers searched the car and

found the heroin.  (Id. at 177:25 – 178:18.)  On cross-examination, attorney Kress asked Miller if

the February 26, 2009 trip was her first trip to New York to buy drugs.  (Id. at 183:19-23.)

Miller testified that she had not previously gone to New York to buy the drugs, and that

Petitioner had always gone to retrieve them.  (Id. at 183:23-25.)  This testimony apparently

conflicts with Davenport's earlier testimony that Miller had accompanied him on at least one

other occasion to buy heroin in New York and bring it back to Pennsylvania.  (Compare id. at

183:23-25 with id. at 143:14-144:3.)  Attorney Kress did not question Miller about any other

trips to New York that may not have been related to narcotics.

In addition, Miller testified about the letter that Davenport sent her from prison asking

her to lie on his behalf.  (Id. at 181:11 – 183:1.)  Miller testified that she received the letter, but

that she ultimately decided to cooperate with law enforcement and implicate Davenport despite

Davenport's wishes.  (Id.)  She testified that after she received the letter, she gave it to her

attorney.  (Id. at 182:4-5.)

Attorney Kress's cross-examination of Miller included eliciting her admission that she

was afraid to go to prison, and that she had a large incentive to cooperate with investigators.

(See id. at 185:6 – 186:4.)  Attorney Kress also delineated the timeline of Miller's assistance on

cross-examination: Miller testified that she began cooperating with law enforcement on the night

of her arrest (id. at 186:2 – 189:9), but that she never mentioned Petitioner as a source of supply

until she was "on the way to [her] plea hearing" (id. at 189:13-15).  Attorney Kress pressed

Miller on the nature of her relationship with Davenport and highlighted for the jury how Miller

only identified Petitioner as the source of heroin after she received Davenport's letter from

prison.  (Id. at 193:16-25.)  Attorney Kress closed his cross examination by calling Miller's

motivation for implicating Petitioner into question: "Q: You get a letter from Mr. Davenport, and

all of the sudden [you identify Petitioner as] the main guy.  Isn't that right?  A: Yep."  (Id. at

195:10-20.)

The Government next called Michael Wayne Sullivan, who had already pleaded guilty to

lesser charges and was bound to cooperate under his plea agreement.  (See Doc. No. 611 at 3; Tr.

at 207: 4-15.)  Sullivan testified that he met Davenport in the years before 2008 when they

shared a cell together at State Correctional Institution - Graterford.  (Doc. No. 611, Tr. at 207:17

– 208:6.)  Sullivan testified that when he was released from SCI-Graterford into the Harrisburg

area, he resumed contact with Davenport.  (Id. at 208:24 – 209:8.)  Sullivan testified that

Davenport paid for his housing, obtained employment for him, and eventually reintroduced him

to the drug trade.  (Id. at 208:24 – 211:22; 214:1 – 215:22.)  Sullivan testified that he was selling

marijuana supplied by Davenport and his associates, (id. at 214: 8-10), riding along with Bobbie Sue Miller when she was making deliveries of heroin (id. at 230:14 – 231:3), and socializing with Davenport, Miller, Petitioner, and other co-conspirators (id. at 217:1 – 218:21).  According to Sullivan's testimony, Sullivan observed Petitioner carrying packages into Davenport's apartment that he presumed to contain drugs, but he never personally witnessed Petitioner with heroin or large sums of cash.  (Id. at 216:1 – 217:4.)  Sullivan testified that he was aware of the February 26, 2009 trip to New York to acquire heroin, but that he did not ride along on the trip. (Id. at 219:9 – 221:1.)  He did, however, accompany Davenport and Petitioner to Baltimore after Miller, Nesbitt, and Owens were arrested.  (Id. at 225:23 – 226:9.)  Sullivan testified that he went to New York City with Davenport after they spent a night in Baltimore, and that he was with Davenport when they were both arrested at the Staten Island Ferry parking lot.  (Id. at 226:9 – 228:4.)

On cross-examination, attorney Kress undermined Sullivan's credibility by insinuating that Sullivan's loyalty to Davenport may have influenced him to testify against Petitioner rather than inculpate Davenport.  (See id. at 231:11 – 233:22.)  Attorney Kress called attention to the fact that Sullivan and Davenport had been cell mates and that they "looked out for each other" while they were incarcerated.  (Id.)  Attorney Kress also highlighted for the jury the substantially shorter sentence Sullivan received in exchange for his cooperation: "Q: Your attorney told you [that] you could be looking at a guideline range of 188 to 235 months.  Do you remember that? A: Yes, sir.  Q: You didn't want to do that much time in prison, did you?  A: No, sir.  Q: So you cut a deal? A: Yes, sir."  (Id. at 239:8-24.)  Attorney Kress elicited that in exchange for a guilty plea and his cooperation, Sullivan received a reduced sentence of 46 months incarceration.  (Id.)

Attorney Kress attempted to gain an admission from Sullivan that his loyalty to Davenport would influence him to lie on Davenport's behalf.  (Id. at 240:5 – 241:11.)

The Government's final witness was Petitioner's state parole officer.[1]  (See Doc. No. 612, Tr. at 299:2 et seq.)  During his brief testimony, the parole officer testified that Petitioner had been a model parolee until shortly before the February 26, 2009 arrests.  (Id. at 300:18 – 303:6.)  According to the parole officer, Petitioner's employer in Harrisburg reported that Petitioner continued to appear for work during March 2009, albeit with reduced hours.  (Id. at 303:9-15.)  Eventually, after he had been able to make contact with Petitioner, the parole officer declared Petitioner delinquent.  (Id. at 304:6-10.)  At the conclusion of the officer's testimony, the Government offered a stipulation of fact into evidence: Petitioner was ultimately apprehended in August of 2010 in Baltimore, Maryland.  (Id. at 305:24 – 306:4.)  At the time of his arrest, Petitioner was using an alias.  (Id.)

After the Government finished presenting its case, the defense did not call any witnesses, and Petitioner did not testify on his own behalf.  (Id. at 309:12-25.)  When the Court asked attorney Kress at sidebar if the defense planned to call witnesses or if Petitioner would be taking the stand, attorney Kress responded: "We've discussed that, and for reasons that the Court and [counsel for the Government] can understand, it would not be to his benefit to permit cross-examination of him."  (Id. at 309:12-16.)  In keeping with established practice, the Court did not colloquy Petitioner about whether he understood his right to testify on his own behalf.  (Id.); see also United States v. Leggett, 162 F.3d 237, 247 (3d Cir. 1998) ("[A] trial court has no duty to explain to the defendant that he or she has a right to testify or to verify that the defendant who is

_____

[1] In total, the Government called nine witnesses: Detective Todd Johnson, Officer Dennis Morris, Jr., co-defendant Omar Davenport, co-defendant Bobbie Sue Miller, co-defendant Michael Wayne Sullivan, co-defendant Andrew Graeff, Ryan Jones (Petitioner's former boss), Special Agent John Langan, Jr., and Parole Officer Luis Rosa.  (See Doc. Nos. 610, 611, 612.)

not testifying has waived the right voluntarily.") (quoting United States v. Pennycooke, 65 F.3d 9, 11 (3d Cir. 1995)).

## II.    LEGAL STANDARD

Under 28 U.S.C. § 2255(a), a federal prisoner may file a motion requesting that the sentencing court vacate, set aside, or correct his sentence on the basis "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  However, Section 2255 does not afford a remedy for all errors that may have been made at trial or during sentencing.  United States v. Essig, 10 F.3d 968, 977 n.25 (3d Cir. 1993) (citing United States v. Addonizio, 442 U.S. 178, 185 (1979)).  Rather, Section 2255 is implicated only when the alleged error raises "a fundamental defect which inherently results in a complete miscarriage of justice."  Addonizio, 442 U.S. at 185.  Under the Antiterrorism and Effective Death Penalty Act, a petitioner has one year from the time his conviction becomes final to file a Section 2255 motion.  28 U.S.C. § 2244.

Further, Section 2255(b) advises that a prisoner may be entitled to a hearing on his motion.  The decision to hold a hearing is wholly within the discretion of the district court.  Gov't of Virgin Islands v. Forte, 865 F.2d 59, 62 (3d Cir. 1989).  When the record affirmatively indicates that a petitioner's claim for relief is without merit, the claim may be decided on the record without a hearing.  See Gov't of Virgin Islands v. Nicholas, 759 F.2d 1073, 1075 (3d Cir. 1985).  If the record conclusively negates the factual predicates asserted in support of a Section 2255 motion, or, if the movant would not be entitled to relief as a matter of law even if the factual predicates as alleged in the motion are true, the trial court may elect not to conduct an evidentiary hearing.  Nicholas, 759 F.2d at 1075.

## III.    DISCUSSION

Petitioner raises five arguments in his Section 2255 petition: (a) trial counsel was ineffective in his cross-examination of Omar Davenport; (b) trial counsel was ineffective in his cross-examination of Bobbie Sue Miller; (c) trial counsel was ineffective in his cross-examination of Michael Wayne Sullivan; (d) "trial counsel was ineffective for his failure to object to multiple acts of prosecutorial misconduct;" (e) trial counsel was ineffective "by interfering with Petitioner's constitutional right to testify" on his own behalf; (f) trial counsel was ineffective by "failing to present Petitioner's defense on multiple issues;" and (g) trial counsel was ineffective based on the cumulative effect of his errors, even if no single error justifies relief.  (Doc. No. 632 at 3-9.)

Each of Petitioner's arguments is based on the alleged ineffectiveness of his court-appointed defense attorney, Laurence Kress.  Section 2255 challenges to convictions or sentences based upon a claim of ineffective assistance of counsel are governed by the two-part test established by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).  George v. Sively, 254 F.3d 438, 443 (3d Cir. 2001).  The first Strickland prong requires Petitioner to "establish first that counsel's performance was deficient."  Jermyn v. Horn, 266 F.3d 257, 282 (3d Cir. 2001).  This prong requires Petitioner to show that counsel made errors "so serious" that counsel was not functioning as guaranteed under the Sixth Amendment.  Id.  In this way, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms.  Id.  (citing Strickland, 466 U.S. at 688).  However, "[t]here is a 'strong presumption' that counsel's performance was reasonable."  Id.  Under the second Strickland prong, Petitioner "must demonstrate that he was prejudiced by counsel's errors."  Id.  This prong requires Petitioner to show that "there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." Id. (quoting Strickland, 466 U.S. at 694.)  "Reasonable probability"

is defined as "a probability sufficient to undermine confidence in the outcome." Id. (quoting

Strickland, 466 U.S. at 694).  Applying the two-prong Strickland standard, the Court turns to

Petitioner's particular claims.

### a.      Ineffective cross-examination of Omar Davenport

Petitioner's first argument is that attorney Kress did not sufficiently impeach Omar

Davenport on cross-examination.  (Doc. No. 632 at 3.)  In particular, Petitioner argues that

attorney Kress failed to exploit Davenport's uncorroborated testimony that on an unspecified

date, Davenport traveled to New York with Bobbie Sue Miller to meet Petitioner and acquire

drugs, but that Petitioner changed the plan and brought the drugs back to Pennsylvania himself.

(See id.; see also Doc. No. 610, Tr. at 143:14 – 144:3.)  According to Petitioner, "[c]ounsel failed

to impeach, by omission, Davenport's testimony about this 'trip,'" and failed to properly develop

and exploit the inconsistency between Davenport's account of events and Bobbie Sue Miller's

contention that she had never been to New York with Davenport to acquire drugs.  (Doc. No. 632

at 3.)  In opposition, the Government argues that Petitioner's claims about counsel's allegedly

ineffective cross-examination are "pure speculation" that "cannot support a claim of

ineffectiveness."  (Doc. No. 641 at 6.)  According to the Government, defense counsel properly

"found an area of inconsistency, stopped appropriately, and utilized it in closing argument to

undercut confidence in Davenport's testimony."  (Id. at 7.)

The Court finds that attorney Kress's performance was not deficient under Strickland.

When arguing that counsel rendered deficient performance, a petitioner "must overcome the

presumption that, under the circumstances, the challenged action might be considered sound trial

strategy."  Berryman v. Morton, 100 F.3d 1089, 1094 (3d Cir. 1996) (quotations omitted).  Upon

a review of the record, Davenport first alluded to this particular trip to New York on cross-

examination.  (See Doc. No. 610, Tr. at 231:11 – 233:22.)  The Court is mindful that the

testimony of Davenport as to this trip may have revealed new information and that attorney

Kress was justified in ending the line of questioning lest Davenport give new testimony –

truthful or otherwise – that would inculpate Petitioner in traveling in interstate commerce or

trafficking drugs.[2]  Later, once attorney Kress elicited contradictory testimony from Bobbie Sue

Miller, he effectively exploited the inconsistency in his closing statement to undermine the

credibility of both Davenport and Miller.  (See Doc. No. 612, Tr. at 338:1-4) (Kress: "She says

she's never been [there] before that night.  He says, yeah, she went up before with me.

Somebody is not telling the truth.  Which one?  Who knows.").  The Court is unmoved by

Petitioner's argument that attorney Kress could have exhaustively cross-examined Davenport

about the previously undisclosed trip to undermine the testimony's credibility, because attorney

Kress's decision to limit potentially inculpatory testimony was justified and because attorney

Kress later incorporated the testimony into the broader defense strategy.  Because the Court finds

that Petitioner has not satisfied the first prong of the Strickland standard with regard to attorney

Kress's cross-examination of Omar Davenport, the Court need not determine whether prejudice

resulted from any deficient performance.  See United States v. Travillion, 759 F.3d 281, 294 (3d

Cir. 2014) ("There is no reason for a court deciding an ineffective assistance claim … even to

---

[2] In his memorandum, Petitioner argues that attorney Kress should have conducted an
investigation into whether Miller had previously traveled with Davenport to New York for drugs
because, "the Government gave Mr. Kress a 'recording' where Davenport is telling the C.I. that
Miller had been to New York for drugs before, and Davenport's laughing."  (Doc. No. 640 at 6.)
The Court questions whether this recording would have created the obligation for attorney Kress
to conduct an independent investigation, especially given attorney Kress's satisfactory treatment
of the issue at trial.

address both components of the inquiry if the [petitioner] makes an insufficient showing on one.") (quoting Marshall v. Hendricks, 307 F.3d 36, 86-87 (3d Cir. 2002)).  However, the Court finds that no prejudice resulted from attorney Kress's cross-examination of Davenport.

### b.    Ineffective cross-examination of Bobbie Sue Miller

Petitioner also argues that attorney Kress was ineffective in his impeachment and cross-examination of Bobbie Sue Miller.  (Doc. No. 632 at 4-5.)   In particular, Petitioner argues that Miller lied about the date she became involved in the drug trade, and counsel was ineffective for failing to sufficiently expose her dishonesty, especially given that Petitioner "told [attorney Kress] that [Miller] was always involved; and during trial [Petitioner] gave [attorney Kress] a heads up that she was 'lying.'"  (Doc. No. 640 at 10-12.)  According to Petitioner, "Miller met me in May, six months prior to the time she was claiming."  (Id. at 13.)  Finally, Petitioner argues that attorney Kress improperly focused his cross-examination of Miller on the letter Davenport sent to her from prison imploring her to lie on his behalf.  (Id. at 14.)  According to Petitioner, Miller was clearly not persuaded by the letter because she reported it to her attorney, and attorney Kress was ineffective for pressing a useless theory.  (Id. at 14.)  In opposition, the Government argues that the evidence consistently indicated that Miller's timeline of her own involvement in the conspiracy was accurate or at least not deceptive, and that regardless, the chronology of Miller's involvement was immaterial to Petitioner's conviction.  (Doc. No. 641 at 7-8.)  The Government also argues that focusing his questioning upon the letter from Davenport to Miller and insinuating that the letter persuaded her to lie was an effective means of cross-examining her.  (Id. at 9.)

The Court finds that attorney Kress's cross-examination was not unconstitutionally deficient under Strickland.  The Court agrees with the Government that, beyond calling Miller's

honesty into question, the date of her entrance into the drug conspiracy is largely immaterial to the testimony she gave about Petitioner's involvement. Therefore, even assuming that attorney Kress was deficient for failing to press Miller about the date of her entrance into the conspiracy, Petitioner has not demonstrated that exposing Miller's lie would have been reasonably likely to change the outcome of his jury trial, especially given the weight of the remaining evidence and the balance of Miller's other uncontroverted testimony.[3] See Travillion, 759 F.3d at 293 ("Nothing in the evidence presented shows that counsel's errors in his cross-examination of [the witness] were so serious, in light of all the evidence and jury instruction, to deprive the defendant of a trial whose result is reliable.")

As to attorney Kress's focus on Davenport's letter to Miller during cross-examination, attorney Kress made a decision to focus his efforts on the letter, specifically calling attention to the suspicious timing of Miller's mention of Petitioner's name to authorities only after she received Davenport's letter asking her to implicate Petitioner. (Doc. No. 610, Tr. at 195:10-20.) This was a matter of sound professional judgment that the Court cannot classify as deficient, even with the benefit of hindsight. In addition, the Court finds that no prejudice resulted to Defendant from attorney Kress's cross-examination of Miller. Consequently, the Court finds that attorney Kress's performance was not deficient as to his cross-examination of Bobbie Sue Miller, and Petitioner's Strickland claim based on counsel's cross-examination of this witness fails.

---

[3] Petitioner also argues that counsel was ineffective for failing to cross-examine Miller about the layout of the apartment she shared with Davenport, because he argues that ambiguity about the layout of the residence may have misled the jury into thinking that Miller was physically in a position to witness drug transactions from different areas of the residence. (Doc. No. 640 at 15.) The Court cannot find, as Petitioner argues, that attorney Kress's decision to forgo expansive inquiry into a relatively minor detail rendered his representation of Petitioner unconstitutionally ineffective.

### c.       Ineffective cross-examination of Michael Wayne Sullivan

Petitioner also argues that attorney Kress failed to effectively impeach and cross-examine Michael Wayne Sullivan.  (Doc. No. 632 at 5-6.)  In particular, Petitioner argues that Sullivan had a particularly strong motivation to cooperate with the Government even to the point of lying because members of his family faced the threat of prosecution.  (Id.)  In opposition, the Government argues that there is no substantiation for Petitioner's assertion that Sullivan's family members faced prosecution or that counsel was otherwise ineffective.  (Doc. No. 641 at 10-11.)

The Court finds that attorney Kress's impeachment and cross-examination of Michael Wayne Sullivan did not render his performance unconstitutionally inadequate under Strickland. To begin, it is not clear from the trial record or from Petitioner's submission that the involvement of Sullivan's family members in the present conspiracy ever came to fruition.  (See Doc. No. 611, Tr. at 227:5-8) (Sullivan: "Omar was going to send [another co-conspirator] back to Harrisburg for him to sell heroin for him.  And Omar wanted me to call somebody, some of my family members to obtain the heroin, but it never happened because we got locked up in Staten Island.")  In addition, attorney Kress focused on Sullivan's personal connection to Davenport and to his other co-defendants to suggest that Sullivan was lying to inculpate Petitioner and benefit his friends.  (See id. at 231:11 – 234:10.)  Attorney Kress also stressed through cross-examination that Sullivan had never actually witnessed Petitioner with drugs or with money from drug transactions.  (See id. at 243:11-25.)  In sum, Petitioner has failed to rebut the presumption that his attorney's performance was reasonable as to Sullivan, and he has not established that his attorney's treatment of this witness caused prejudice as necessary under Strickland.

### d.       Failure to object to prosecutorial misconduct

Petitioner's fourth argument is that attorney Kress failed to object when counsel for the Government mischaracterized parts of witness testimony during closing arguments.  (Doc. No. 632 at 6.)  In particular, Petitioner argues that Sullivan testified to seeing Petitioner enter the Davenport residence on multiple occasions and that after these visits Davenport's heroin supply was replenished, whereas the prosecutor represented to the jury during closing arguments that Sullivan directly saw Petitioner enter the Davenport residence with drugs.  (Doc. No. 640 at 25-27.)  In opposition, the Government argues that its counsel's characterization of Sullivan's testimony in closing arguments was not misleading.  (Doc. No. 641 at 11.)

The Court cannot find that the prosecutor committed prosecutorial misconduct in his characterization of Sullivan's testimony, so counsel's failure to object to the alleged misconduct cannot support a <u>Strickland</u> claim.  Upon a review of the transcript, the Court does not find that counsel for the Government mischaracterized Sullivan's testimony during closing statements at the points where Petitioner asserts, "the prosecutor told the jury that Sullivan saw the drugs that Petitioner brought into Davenport's house on multiple occasions."  (<u>See</u> Doc. No. 640 at 26); (<u>see</u> <u>also</u> Doc. No. 612, Tr. at 314:12; 314:20-25; 325:10-14; 342:8-10).  For example, in one such passage identified by Petitioner as objectionable, counsel for the Government said that Sullivan, "observed occasions where there was a quasi-transaction where they would go off to a room by themselves and come out, as I believe what [Sullivan] testified to, and then all of the sudden they would have dope again."  (Doc. No. 612, Tr. at 325:11-15.)  This is a fair description of Sullivan's testimony.  Sullivan testified that he "didn't actually see a [drug] transaction, but" that Sullivan had "seen [Petitioner] come" to Davenport's residence while Sullivan was present. (Doc. No. 611, Tr. at 216:1 – 217:4.)  Sullivan testified that Davenport would summon Petitioner "if the supply [of heroin] would get low," that Petitioner would arrive

16

and "would have a bag with him," that a transaction of some kind would occur out of Sullivan's

view, and that Petitioner would leave the residence after this transaction.  (Id.)  The Court cannot

find that any prosecutorial misconduct occurred, so attorney Kress's failure to object was not

unconstitutionally ineffective as Petitioner argues.  It follows that no prejudice resulted to

Petitioner as a result.

> ### e.       Interference with right to testify

Petitioner also argues that attorney Kress waived Petitioner's right to testify in his own

defense "without Petitioner's knowledge and voluntary consent."  (Doc. No. 632 at 6-7.)

Petitioner attached a factual declaration to his supporting memorandum in support of this claim.

(See Doc. No. 640-1.)  In this declaration, Petitioner avers that counsel "never advised [him] that

it was his own decision, and not [counsel's decision] to decide whether" Petitioner would testify

at his trial, and further that counsel did not inform Petitioner "about the constitutional demension

[sic] to decide this question for [himself]."  (Doc. No. 640-1 at 2.)  According to Petitioner,

counsel discussed whether Petitioner would testify on two separate occasions.  (See id.)

According to the declaration, the first occurred five days before trial during a prison visit when

according to Petitioner, "Mr. Kress blurted out, in an assertive and categorical, but somewhat

authoritative manner," that "'I'm not putting you on the stand because that's going to open the

door for your convictions to come in.'"  (Id.)  According to the declaration, this was the extent of

the discussion during counsel's visit.  (Id.)

The second discussion, according to the declaration, occurred during the second day of

trial after Michael Wayne Sullivan finished giving testimony.  (Id.)  This discussion occurred in

Petitioner's holding cell at the federal courthouse in Harrisburg.  (Id.)  According to the

declaration, attorney Kress told Petitioner that:

> I don't feel good about not putting you on the stand because it is not going to look good in the eyes of the jury if you don't take the stand and testify. It almost never looks good for a defendant to a jury when he does not testify; but, I really don't want to put you on the stand because that's going to allow the government to bring in your convictions.  This is a really tough decision to make.

(Id.)  According to the declaration, after attorney Kress finished speaking, Petitioner offered to testify "if that's what I need to do."  (Id. at 3.)

Petitioner's declaration identifies certain information that Petitioner sought to introduce through his own testimony.  (Id.)  In particular, Petitioner believed that without his testimony, the jury would believe that when he left Harrisburg for Baltimore following the arrests of his co-defendants, he had done so to avoid prosecution for the charges he faced based on his participation in their drug conspiracy.  (See id.)  Petitioner wanted to offer the jury an alternative explanation for why he had absconded from state parole, to wit, that he had violated the terms of his parole by merely socializing with drug dealers and did not want to be remanded to state custody for that violation.  (Id.)  In the declaration, Petitioner maintains that had he known of his constitutional right to testify, he would have overridden attorney Kress's strategic decision and taken the stand in his own defense.  (Id.)  He further avers that "I never had anything to do with Davenport's drug conspiracy so I never had anything to fear about being federally indicted."  (Id. at 3-5.)  Petitioner avers that when attorney Kress represented to the Court that Petitioner would not be testifying, counsel did so without Petitioner's knowledge or consent.  (Id.)  "I just wish Mr. Kress would have explained to me that the final and ultimate decision of whether I would testify or not was ultimately up to me and not him; or at least asked me if I wanted to testify or not before he waived my right."  (Id. at 5.)

During his closing statement, attorney Kress did argue that Petitioner may have absconded from his state parole for any number of reasons.  (See Doc. No. 612, Tr. at 329:6-25).

Kress argued that Petitioner's flight from Harrisburg was not evidence of an awareness of guilt because after Petitioner drove Sullivan and Davenport to Baltimore, Petitioner returned to Harrisburg before leaving again weeks later for Baltimore where he was later arrested under an alias.  (Id.)  Attorney Kress began the substantive portion of his summation with this issue:

> First of all, I have to address this, Mr. Arrington did take off from his parole . . . . But people do it for different reasons that are personal to them. The Government would have you believe he did it because he was afraid he was going to get caught . . . . [But] [i]f Mr. Arrington was so worried about getting caught . . . why did he go back to Harrisburg?  And he did. He was there for three weeks.  If he was so worried, why didn't he stay in Baltimore or go to New York with his friends to continue drug trafficking? He didn't.  He went back. … It's not evidence of drug trafficking.  They'll claim it shows a guilty mind, but again, ladies and gentlemen, I ask you to focus, where is the real evidence in this case?  Where is their evidence?

(Id.)

In opposition to Petitioner's petition and declaration, the Government avers that, upon belief, the decision not to testify was made personally by Petitioner.  (Doc. No. 641 at 11.)  In addition, the Government argues that Petitioner's allegations do not demonstrate a likelihood of prejudice as would be necessary to sustain a claim under Strickland, and that Petitioner has not articulated how his proposed testimony would have been genuinely exculpatory and unrefuted by the existing record.  (Id. at 12) (citing Palmer v. Hendricks, 592 F.3d 386, 396-99 (3d Cir. 2010)).

There is no question that the United States Constitution grants every criminal defendant the right to testify in his or her own defense.  United States v. Pennycooke, 65 F.3d 9, 10 (3d Cir. 1995).  The right is personal to a defendant and may not be waived by the defendant's attorney. Id.  However, the defendant may validly waive the right to testify on his or her own behalf, provided that such waiver is made knowingly, voluntarily, and intelligently.  Id. at 10-11.  In the context of collateral review, the Strickland standard governs a petitioner's claim that his or her

attorney failed to adequately inform the petitioner about his or her right to testify or interfered

with the petitioner's desire to take the stand.  Pennycooke, 65 F.3d at 13.  As explained above,

Strickland requires that a petitioner demonstrate (1) that defense counsel's performance was

deficient, and (2) that the deficient performance prejudiced the petitioner.  Jermyn v. Horn, 266

F.3d 257, 282 (3d Cir. 2001).

Applying Strickland's first prong, a petitioner must overcome the strong presumption that

his or her attorney acted within a broad range of acceptable professional conduct.  Id.  Courts

applying Strickland to right-to-testify claims have held that professional conduct in this context

requires that defense counsel both ensure that a petitioner is informed about his or her right to

testify, and to ensure that if the petitioner waives his or her right, the petitioner does so

knowingly and voluntarily.  Id.; see also United States v. Lore, 26 F. Supp. 2d 729, 738-39

(D.N.J. 1998) (applying Strickland to right-to-testify claim); United States v. Gray, No. 09-150-

1, 2014 WL 7271247, at **2-3 (E.D. Pa. Dec. 19, 2014) (same); Reyeros v. United States, Nos.

10-3020, 10-2907, 2011 WL 5080308, at **8-9 (D.N.J. Oct. 24, 2011) ("[W]ithout evidence

suggesting otherwise, a defendant who does not testify at trial is presumed to have voluntarily

waived his right to testify.").  The Court begins its analysis of this claim with the presumption

that attorney Kress's performance complied with the mandates of professional conduct.  See

Jermyn, 266 F.3d at 282.

The Court finds that Petitioner has not defeated the presumption that attorney Kress

ensured that Petitioner both understood the right to testify and waived it knowingly and

voluntarily.  Petitioner repeatedly stresses in his supporting affidavit that attorney Kress failed to

apprise him of his right to testify, and that as a result, Petitioner did not take the stand when he

otherwise would have done so.  (See Doc. No. 604-1 at 3-5.)  However, Petitioner's own

declaration and attorney Kress's response to the Court's inquiry about defense witnesses establish that discussions on the subject of Petitioner testifying were indeed held, and that the attorney and Petitioner collaboratively decided that Petitioner would not testify at trial.  (See Doc. No. 612, Tr. at 309:12-16); (see also Doc. No. 640-1 at 3) ("I [(Petitioner)] immediately told [attorney Kress]: 'I'll testify.  I don't have no problem testifying if that's what I need to do. If you need me to get on that stand, I'll do it.'").  In his declaration, Petitioner claims that attorney Kress informed the Court that Petitioner would not be testifying at a sidebar without Petitioner's knowledge or consent.  (Doc. No. 640-1 at 3.)  However, the trial transcript indicates that after the sidebar concluded, attorney Kress also announced to the jury in open court that the defense had decided not to present its own evidence.  (Doc. No. 612, Tr. at 309:22-25.) Petitioner had the opportunity to insist on testifying at this juncture and did not do so.  Given the presumption that counsel's representation comported with professional standards and indications from both Petitioner's filing and the trial transcripts that discussions occurred, the Court finds that Petitioner has not demonstrated that counsel's performance was deficient so as to satisfy the first Strickland prong.  This result comports with at least one other district court disposition from this circuit, where a petitioner's affidavit was held insufficient to rebut the presumption of competent representation where the record indicated that discussions occurred on whether or not the petitioner would testify on his own behalf.[4]  See Reyeros v. United States, Nos. 10-3020, 10-2907, 2011 WL 5080308, at **8-9 (D.N.J. Oct. 24, 2011).

---

[4] Unless an evidentiary hearing convenes, habeas courts are bound to accept as true all non-frivolous factual allegations made in a habeas petition.  Gov't of Virgin Islands v. Forte, 865 F.2d 59, 62 (3d Cir. 1989).  While the Court finds that Petitioner's repeated factual allegations that attorney Kress did not apprise him of his constitutional right to testify on his own behalf are not supported by Petitioner's own declaration and the balance of the record, the Court refrains from designating the allegations as wholly frivolous.  As a result, the Court's finding as to the

The Court also finds that Petitioner has not satisfied the second Strickland prong requiring prejudice.  The Court must determine whether Petitioner's testimony, had it been presented to the jury, could reasonably have changed the outcome of his trial.  Jermyn, 266 F.3d at 282-83.  In this context, as in other Strickland contexts, there is no presumption that counsel's performance resulted in prejudice; the onus remains with Petitioner to make a prima facie demonstration that prejudice resulted.  Palmer v. Hendricks, 592 F.3d 386, 399 (3d Cir. 2010).  The Court conducts this analysis by turning to Petitioner's proposed testimony, as laid out in his Section 2255 motion and supporting documents, and viewing it against the record as a whole.  Id. ("In other words, when a defendant states, 'I would have testified to X, Y, and Z, but my attorney would not put me on the stand,' the significance of such testimony can be evaluated in the context of the remainder of the evidence in order to assess the impact of the constitutional violation[.]").

In the present case, the Court finds that the result of Petitioner's trial would not have changed had Petitioner presented the testimony he now proposes.  Petitioner writes in his declaration that he was not involved in the drug conspiracy contained in the indictment.  (Doc. No. 640-1 at 5.)  However, Petitioner does not argue that he would have testified as to his overall innocence, rather Petitioner proposes testimony related exclusively to his flight from state parole in the wake of his co-defendants' arrests.  (See id. at 4-6) ("I would have told the jury the following: The reason I absconded from parole and left Pennsylvania had absolutely nothing to do with a fear that the federal government would indict me.")  According to Petitioner, he feared re-incarceration because he had lied to his parole officer, associated with drug dealers, and changed addresses without his parole officer's knowledge.  (Id. at 5-8.)  He continues, "If I was

---

Strickland deficiency prong is made in the alternative, and the Court instead bases its denial of Petitioner's right-to-testify claim on Petitioner's failure to satisfy Strickland's prejudice prong.

worried about the federal government, I would not have went to work (or staying in Harrisburg) my job at a car wash for three entire weeks after I heard about Davenport's trouble with the federal government."  (Id. at 7.)

Upon a review of the entire record, the Court finds that Petitioner's proposed testimony could not reasonably have affected the outcome of his trial.  The Government called co-defendants, Omar Davenport, Bobbie Sue Miller, and Michael Wayne Sullivan.  All three identified Petitioner as being involved in the drug conspiracy.  Each of these defendants was implicated in the drug conspiracy by strong physical evidence, and prosecutors explicitly invoked criminal conspiracy liability theories.  The testimony of these witnesses was corroborated by the testimony of one another and by the testimony of a fourth co-defendant, Andrew Graeff, who identified Petitioner as a close associate of both Davenport and Sullivan. (See Doc. No. 611, Tr. at 245:14 et seq.)  The Court finds now, as it did when denying Petitioner's partial Rule 29 motion at trial, that the Government's case against Petitioner was more than adequate to secure a conviction, even without evidence of Petitioner's parole violation.

Regarding the parole violation, the Government called two witnesses, Petitioner's boss at the car wash in Harrisburg and Petitioner's parole officer, both of whom identified Petitioner as a parolee who eventually absconded.  (Id. at 256:2 et seq.); (Doc. No. 612, Tr. at 299:15 et seq.). The Court permitted the introduction of the flight-from-parole evidence "for the proper purpose of proving consciousness of guilt."  (See Doc. No. 562 at 3) (pre-trial order on motion in limine). Even were the Court to assume that this evidence was material to the jury in deliberations, the Court does not find that Petitioner's proposed testimony would have changed the outcome of jury deliberations in light of the potential for cross-examination.

This is especially true given that Petitioner's counsel conveyed the same idea to the jury that Petitioner proposes to convey with his own testimony.  The Court is cognizant that an attorney's statement may be a poor substitute for the testimony of a criminally accused.  See United States v. Lore, 26 F. Supp. 2d 729, 740 (D.N.J. 1998) (quoting Nicholas v. Butler, 953 F.2d 1550, 1553 (11th Cir. 1992)).  However, given the ramifications of potentially subjecting Petitioner to cross-examination about his other conviction and the precise circumstances of his eventual arrest, see Fed. R. Evid. 609, the Court cannot say that Petitioner's own testimony about his motivation for absconding from parole would have been any more persuasive than his counsel's presentation on the subject.  During closing statements, attorney Kress skillfully suggested that Petitioner absconded from parole for reasons other than an awareness of guilt related to the drug conspiracy.  Indeed, Petitioner's counsel argued for the jury that Petitioner would not have returned to Harrisburg and worked at the car wash for three weeks after his co-defendants' arrests had he been concerned about federal prosecution, (Doc. No. 612, Tr. at 329:17-25); Petitioner himself relies on this piece of information as support for his own proposed testimony (Doc. No. 640-1 at 7).

In sum, the Court finds that Petitioner has failed to make a prima facie showing of prejudice, and so his right-to-testify ineffective assistance of counsel claim fails under Strickland's second prong.

**f.     Failure to present a defense**

Next, Petitioner argues that attorney Kress was ineffective for failing to suggest to the jury that "Rum," the man from whom Miller, Sullivan, and Nesbitt secured heroin in Brooklyn directly before their roadside arrests, was probably the source of the conspiracy's heroin all along.  (Doc. No. 632 at 7-8.)  Petitioner also argues that counsel was ineffective for failing to

elicit testimony from Petitioner's parole officer that a parolee could be cited for merely socializing with drug dealers.  (Id.)  In opposition, the Government briefly argues that "it is unclear how" the tactics Petitioner now suggests "would have provided a stronger defense than the presentation provided by his trial counsel."  (Doc. No. 641 at 12.)

The Court is unmoved by Petitioner's claim.  Petitioner's counsel did insinuate at trial that Davenport was the true leader of the conspiracy because he already knew Rum and other contacts.  (See Doc. No. 612, Tr. at 330:8-16.)  In addition, counsel elicited testimony from Petitioner's parole officer that the officer "had no reason to suspect or believe that [Petitioner] was involved in illegal drug trafficking," (id. at 305:15-18), and in his closing statement, attorney Kress suggested to the jury that Petitioner may have absconded for reasons other than the present indictment, (id. at 329:6-25).  Petitioner has not demonstrated that his counsel was ineffective in handling the issues of Rum or Petitioner's flight from supervision, or that prejudice resulted.  See Jermyn v. Horn, 266 F.3d 257, 282-83 (3d Cir. 2001).  Consequently, the Court will deny Petitioner's claim.

### g.    Cumulative error

Petitioner argues that even if no single error on the part of his counsel taken alone entitles him to relief, the cumulative effect of attorney Kress's errors entitles Petitioner to relief.  (Doc. No. 632 at 8.)  "Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process."  Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008).  In order to demonstrate entitlement to relief based on cumulated errors, a petitioner must demonstrate "actual prejudice."  Id.

Above, the Court found no deficient conduct as to each of Petitioner's several claims of ineffective assistance of counsel. Similarly, the Court found that no appreciable prejudice resulted to Petitioner as a result of attorney Kress's conduct as to each of Petitioner's claims. It follows that, even accounting for Petitioner's claims altogether, he is not entitled to relief. Consequently, the Court will deny Petitioner's cumulative error claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court will deny Petitioner's motion to vacate. In light of the Court's denial of Petitioner's motion to vacate, and upon review of Petitioner's requests for discovery and supporting documentation, the Court does not find good cause to authorize discovery in this case. Petitioner's discovery motions will be denied.

In addition, the Court finds that Petitioner has not made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(2). Accordingly, no certificate of appealability shall issue. An order consistent with this memorandum follows.